IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

**ORPHA HALES**, Survivor of
GARLAND HALES,[1]

      Plaintiff,

      v.

**CAROLYN W. COLVIN**,
Acting Commissioner of the Social
Security Administration,

      Defendant.

Case No. 6:14-cv-01050-MC

**OPINION AND ORDER**

_____

**MCSHANE, Judge:**

      Plaintiff Garland Hales brings this action for judicial review of the final decision of the Commissioner of the Social Security Administration denying his application for disability insurance benefits (DIB) and supplemental security income payments (SSI) under Titles II and XVI of the Social Security Act. This Court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

      The issues before this Court are: (1) whether the Administrative Law Judge (ALJ) erred in evaluating the medical opinion of treating psychiatrist Dr. Garwood; (2) whether the ALJ erred in evaluating plaintiff's credibility; and (3) whether the ALJ erred in evaluating a lay witness's credibility. Because the ALJ articulated sufficient reasons that were supported by substantial evidence in the record, the Commissioner's decision is AFFIRMED.

---

[1] Garland Hales died on May 22, 2015. *See* Pl.'s Suggestion of Death, ECF No. 13, 1. Orpha Hales, who is the surviving mother of Garland Hales, was substituted as plaintiff under FRCP 25(a) on September 24, 2015. For the sake of simplicity, this Court will refer to Garland Hales as the "plaintiff" throughout this opinion.

1 – OPINION AND ORDER

**PROCEDURAL AND FACTUAL BACKGROUND**

Plaintiff applied for DIB and SSI on February 19, 2009, alleging disability since January 25, 2006. Tr. 13, 126. These claims were denied initially and upon consideration. Tr. 146–55, 159–65. Plaintiff timely requested a hearing before an ALJ, and appeared before the Honorable James Yellowtail on November 14, 2011. Tr. 85–118, 126. ALJ Yellowtail denied plaintiff's claims by written decision dated November 25, 2011. Tr. 126–35. Plaintiff sought review from the Appeals Council, which vacated the written decision and remanded the case for further proceedings. Tr. 142–44.

Plaintiff appeared before the Honorable Ted Neiswanger for a second administrative hearing on August 15, 2012. Tr. 41–84. ALJ Neiswanger denied plaintiff's claims by written decision dated September 18, 2012. Tr. 13–28. Plaintiff sought review from the Appeals Council, which was subsequently denied, thus rendering the ALJ's decision final. Tr. 1–3. Plaintiff now seeks judicial review.

Plaintiff, born on November 30, 1948, tr. 89, 249, 256, graduated from high school, tr. 90, 357, attended some community college, tr. 90, 357, and worked most recently as an emergency dispatcher (1972–1996) and towing dispatcher (1997–2006), tr. 27, 276–79, 295–98. Plaintiff was fifty-six at the time of alleged disability onset and sixty-three at the time of his second administrative hearing. *See* tr. 89, 249, 256.[2] Plaintiff alleges disability due to a combination of physical and mental limitations, including: depression; Post-Traumatic Stress Disorder (PTSD); anxiety; panic; left knee problems; and an inflamed right ankle. *See* Pl.'s Br. 4, ECF No. 10.

---

[2] Plaintiff was a "person of advanced age" at the time of alleged disability onset and at the time of his second administrative hearing. *See* 20 C.F.R. § 404.1563(d).

2 – OPINION AND ORDER

## STANDARD OF REVIEW

The reviewing court shall affirm the Commissioner's decision if the decision is based on proper legal standards and the legal findings are supported by substantial evidence on the record. *See* 42 U.S.C. § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). To determine whether substantial evidence exists, this Court reviews the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion. *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986).

## DISCUSSION

The Social Security Administration utilizes a five-step sequential evaluation to determine if a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920. The initial burden of proof rests upon the claimant to meet the first four steps. If a claimant satisfies his or her burden with respect to the first four steps, the burden shifts to the Commissioner for step five. 20 C.F.R. § 404.1520. At step five, the Commissioner's burden is to demonstrate that the claimant is capable of making an adjustment to other work after considering the claimant's residual functional capacity (RFC), age, education, and work experience. *Id.*

Plaintiff contends that adequate evidence does not support the ALJ's disability decision and that it is not based on the correct legal standards. Pl.'s Br. 4, ECF No. 10. In particular, plaintiff argues that: (1) the ALJ erred in evaluating the medical opinion of treating psychiatrist Dr. Garwood; (2) the ALJ erred in evaluating plaintiff's credibility; and (3) the ALJ erred in evaluating a lay witness's credibility.

### I. Dr. Garwood's Medical Opinion

Plaintiff contends that the ALJ improperly rejected functional limitations identified by treating psychiatrist Les Garwood, D.O. Pl.'s Br. 5–12, ECF No. 10. In response, defendant argues that the ALJ properly assessed Dr. Garwood's opinion. Def.'s Br. 4–8, ECF No. 11.

"To reject an uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (citing *Lester v. Chater*, 81 F.3d 821, 830–31 (9th Cir. 1995)). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (citation omitted). When evaluating conflicting medical opinions, an ALJ need not accept a brief, conclusory, or inadequately supported opinion. *Id.* (citing *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001)). Because Dr. Garwood's opinion is contradicted in the record,[3] the ALJ can only reject it by providing specific and legitimate reasons that are supported by substantial evidence.

Plaintiff met with Dr. Garwood approximately ten times between October 2010 and April 2012.[4] On or about August 17, 2012, Dr. Garwood submitted a mental residual functional capacity assessment on plaintiff's behalf. *See* tr. 1051–54. In that assessment, Dr. Garwood

---

[3] *See* tr. 355–63 (On April 6, 2006, Michael Leland, Psy.D., CRC, opined that plaintiff's attention, concentration, and mental tracking were all within normal limits.) tr. 559 (On October 18, 2007, Claudia Hardwick, Ph.D., determined that plaintiff did not have a mental impairment that would be detrimental in a work situation.); tr. 382–87 (On June 23, 2008, Pamela Joffe, Ph.D., opined that plaintiff was able to adequately understand and remember instructions, and interact appropriately in public. Dr. Joffe also opined that "maintaining attention and concentration throughout a normal workweek and workday" may be more challenging for plaintiff because he had poor physical health and had not worked in some time.); tr. 580–85 (On November 24 and December 8, 2008, Scott Woods, M.A., and Rex Turner, Ph.D., administered a neuropsychological evaluation and determined that plaintiff had a high level of intellectual ability and a strong working memory.); tr. 425 (On May 27, 2009, Kordell Kennemer, Psy.D., opined that plaintiff had mild restrictions in maintaining concentration, persistence, or pace.); tr. 441 (On December 14, 2009, Paul Rethinger, Ph.D., affirmed Dr. Kennemer's RFC findings.); tr. 49. (On August 15, 2012, John Nance, Ph.D., opined that plaintiff had mild limitations in persistence, concentration, and pace.).

[4] *See* tr. 749–56, 654 (10/14/2010); tr. 650, 715–24 (11/19/2010); tr. 649, 686–93 (1/4/2011); tr. 820–26, 850–55 (3/4/2011); tr. 808–15 (4/15/2011); 767–74, 1040–47 (6/17/2011); tr. 1010–16 (9/8/2011); tr. 983–92 (1/6/2012); tr. 950–57 (2/21/2012); tr. 912–22 (4/6/2012).

4 – OPINION AND ORDER

opined that plaintiff had moderate limitations in his ability to: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; work in coordination or proximity with others without being distracted; interact in the general public; accept instructions and respond appropriately to criticism from supervisors; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and respond appropriately to normal hazards. Tr. 1052–53. Dr. Garwood also opined that plaintiff had moderately severe limitations in his ability to: perform activities within a schedule, maintain regular attendance, and be punctual; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without unreasonable rest periods; respond appropriately to changes in the work setting; and set realistic goals. Tr. 1052–54. Dr. Garwood explained these limitations by commenting:

> Veteran has moderately severe chronic PTSD [and] major depression[.] His chronic, relatively low-functioning adult lifestyle, consequent to this leaves him ill-equipped to function meaningfully in the context of gainful employment.

Tr. 1054.

The ALJ, after reviewing this assessment, rejected Dr. Garwood's opined functional limitations on performing within a schedule, following detailed instructions, and completing a normal workday or workweek. Tr. 25. In rejecting these limitations, the ALJ relied on three bases: (1) the objective medical evidence, including the medical opinion of non-examining psychologist Dr. Nance; (2) Dr. Garwood's insufficient explanation; and (3) plaintiff's daily activities. *See* tr. 25.

As to the objective medical evidence, the ALJ found that Dr. Garwood's opined functional limitations were "inconsistent with the more specific treatment records regarding the claimant's functioning and activities." Tr. 25. The ALJ also found that independent medical testing and variable Global Assessment of Functioning (GAF) scores[5] demonstrated inconsistencies between the treatment records and Dr. Garwood's reported opinions. Tr. 25. This Court looks to each proffered reason.

First, the ALJ concluded that testing performed by treating and examining sources demonstrated that plaintiff "performed in the average to superior range on most tasks." Tr. 25. On November 24, 2008, and on December 8, 2008, plaintiff underwent a five-hour neuropsychological examination[6] with Rex Turner, Ph.D., and Scott Woods, M.A. Tr. 582–85. As a result of this examination, plaintiff received mostly high scores, which indicated "a high level of intellectual ability and a strong working memory." Tr. 584. For example, plaintiff received a score of 116 on the Full-Scale Intellectual Quotient (FSIQ), which is in the high-average range at the 86th percentile, and scores of 17 and 18 on Matrix Reasoning and Digit Span, which are both in the 99th percentile. Tr. 582–83. Dr. Turner and Mr. Woods opined that "the predominance of high scores on the tests suggest that [plaintiff] does not have a cognitive disorder," adding that "[plaintiff's] long-term dependence on his sister . . . may have contributed to a low score on tests like comprehension." Tr. 584–85; *see also infra* n.11 (commenting on plaintiff's sister's behavior during the examination). These findings were largely consistent with

---

[5] A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." *Vargas v. Lambert,* 159 F .3d 1161, 1164 n.2 (9th Cir.1998) (citing *Diagnostic and Statistical Manual of Mental Disorders* 20 (rev. 3d ed. 1987)). A GAF score includes two components: symptom severity and functioning. *See Diagnostic and Statistical Manual of Mental Disorders* 32 (rev. 4th ed. 2000).

[6] Plaintiff was administered the Wechsler Adult Intelligence Scale-III, the Wechsler Adult Intelligence Scale-III Subtest, and the Wechsler Memory Scale-III. Tr. 583–84.

6 – OPINION AND ORDER

a psychodiagnostic evaluation in April 2006, *see* tr. 360 ("Attention, concentration and mental tracking were well within normal limits."), a Compensation and Pension (C&P) evaluation in October 2007, *see* tr. 559 ("[Plaintiff] has no functional mental health impairment for work."), and a psychodiagnostic evaluation in June 2008, *see* tr. 386 ("[Plaintiff] appears to be a bright man and can adequately understand and remember instructions."). The ALJ reasonably relied upon this objective medical evidence to conclude that plaintiff functioned at a level higher than the functional limitations alleged.

Second, the ALJ incorporated plaintiff's assigned "[m]oderate GAF scores in the 60s down to [the] low 50s" into the RFC, *see* tr. 25, but rejected plaintiff's assigned lower, more severe GAF scores ranging between 41 and 50, *see* tr. 23, 25–26. Plaintiff contends that these lower GAF scores-ranging between 41 and 50[7] support Dr. Garwood's opined limitations and undermine the RFC. This Court is not persuaded.

The ALJ discounted these lower scores because many of them originated with "other sources" and because they were inconsistent with the objective medical evidence. *See* tr. 23, 25–27. Dr. Nance opined, and the ALJ agreed, that more weight should be given to the GAF scores of "acceptable medical sources" because those sources had more extensive training and clinical backgrounds than "other sources" such as social workers and treating counselors. Tr. 23. Because plaintiff contests this characterization of the evidence, this Court looks to the record.

Between October 2007 and June 2008, plaintiff underwent a C&P evaluation, *see* tr. 554–60, and a psychodiagnostic assessment, tr. 382–87. As a result of these examinations, plaintiff

---

[7] A GAF score between 41 and 50 "describes serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting)" and includes "any impairment in social, occupation, or school functioning (e.g., no friends, unable to keep a job)." *Diagnostic and Statistical Manual of Mental Disorders* 32 (rev. 4th ed. 2000).

7 – OPINION AND ORDER

was assigned a GAF score of 70 in October 2007, tr. 559, and a GAF score of 60 in June 2008, tr. 386.

Between November 2008 and March 2009, Matthew Gomez, D.O., assigned plaintiff GAF scores ranging from 42 to 43 on five different occasions. *See* tr. 546–47. These scores, which were based on limited evaluations, *see* tr. 589–591 (11/21/2008); tr. 578–80 (12/18/2008); tr. 574–76 (1/22/2009); tr. 569–71 (2/19/2009); 560–62 (3/20/2009), conflicted with the GAF score of 64 assigned by Dr. Turner and Mr. Woods in January 2009, tr. 584, and the GAF scores of 51 assigned by Sonja Fry, LCSW, on six different occasions during that same period, *see* tr. 598–600 (10/23/2008); tr. 591–93 (11/21/2008); tr. 576–77 (12/18/2008); tr. 572–73 (1/23/2009); tr. 567–69 (2/24/2009); tr. 562–64 (3/20/2009). The ALJ credited the assigned score of Dr. Turner and Mr. Woods, which was based on the five-hour neuropsychological examination discussed above. Tr. 25.[8]

Between February 2010 and January 2012, Dan Rupe, LCSW, Sonja Fry, LCSW, and Mitch Trotter, Social Worker Intern, assigned plaintiff GAF scores ranging from 41 to 48 on ten different occasions. *See* tr. 469 (2/12/2010); tr. 746 (10/15/2010); tr. 733 (11/9/2010); tr. 703 (12/6/2010); tr. 686 (1/5/2011); tr. 680, 870 (2/3/2011); tr. 819, 850 (3/10/2011); tr. 783 (6/9/2011); tr. 1036 (7/11/2011); tr. 981 (1/19/2012). These scores, which did not originate with "acceptable medical sources," *see* 20 C.F.R. § 404.1513(a) (defining "acceptable medical sources"), largely conflicted with the GAF scores ranging from 45 to 52 assigned by Dr. Garwood during that same period, *compare* tr. 1036, 981 (assigning GAF scores of 41 on 7/11/2011 and 1/19/2012), *with* tr. 1010–16 (assigning GAF score of 52 on 9/8/2011); tr. 983–92

---

[8] Plaintiff did not challenge the ALJ's evaluation of Dr. Gomez's credibility. As a result, this issue has been waived. *See Greyer v. Barnhart,* 464 F.3d 968, 973 (9th Cir. 2006).

(assigning GAF score of 50 on 1/6/2012). Moreover, the lower GAF scores ranging from 41 to 48 conflicted with earlier, higher GAF scores from Drs. Hardwick, Turner, and Joffe, who are "acceptable medical sources." *Compare* tr. 850 (Ms. Fry assigned GAF score of 41 on 3/10/2011), *with* tr. 559 (Dr. Hardwick assigned a GAF score of 70 on 10/18/2007); tr. 386 (Dr. Joffe assigned a GAF score of 60 on 6/23/2008); tr. 584 (Mr. Woods and Dr. Turner assigned a GAF score of 64 on 1/27/2009 and 1/29/2009). As a result, the ALJ properly discounted these lower GAF scores because many of them did not come from "acceptable medical sources" and the remaining lower GAF scores were inconsistent with objective medical evidence.

In any event, a GAF score "does not have a direct correlation to the severity requirements in [the] mental disorders listing." Revised Medical Criteria for Evaluating Mental Disorders & Traumatic Brain Injury, 65 Fed. Reg. 50746-01, 50764–65 (Aug. 21, 2000); *see also Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013) ("It was recommended that the GAF be dropped from DSM–5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice."); *Bonk v. Astrue,* No. 3:11-CV-00637-BR, 2012 WL 5830392, at *11 (D. Or. Nov. 16, 2012) (noting that "an ALJ's failure to address specific GAF scores does not constitute legal error[.]" (citation omitted)).

As to Dr. Garwood's insufficient explanation, the ALJ found that the "check box form" assessment was not adequately explained. *See* tr. 25. An ALJ need not accept a brief, conclusory, or inadequately supported opinion. *Tonapetyan*, 242 F.3d at 1149. As discussed above, Dr. Garwood completed a mental residual functional capacity assessment on August 17, 2012, in which he opined that plaintiff had multiple moderately severe limitations. *See* tr. 1052–54. To substantiate these limitations, Dr. Garwood identified plaintiff's PTSD and major depressive

9 – OPINION AND ORDER

disorder, and noted that plaintiff lived a "relatively low-functioning adult lifestyle" that left him "ill-equipped to function meaningfully in the context of gainful employment." Tr. 1054. This explanation, which failed to reference any specific diagnostic evidence,[9] is insufficient to explain Dr. Garwood's conclusory findings to the extent they differed from the RFC. *See Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996) ("The ALJ . . . permissibly rejected . . . check-off reports that did not contain any explanation of the bases of their conclusions." (citation omitted)).

As to plaintiff's daily activities, the ALJ found that these activities demonstrated that plaintiff could perform within a schedule. Tr. 25. For example, plaintiff cared for his elderly mother, *see* tr. 305, 507, 562, 607, 732, he drove other veterans as part of the Vet Lift program, *see* tr. 746, 913, 917, and he actively participated in his church's choir, including acting as choir director, *see* tr. 308, 386, 507, 556, 560, 562, 840. The ALJ reasonably interpreted these activities as inconsistent with Dr. Garwood's conclusory finding that plaintiff had moderately severe limitations in his ability to complete a workday or workweek.

In sum, the ALJ's evaluation of Dr. Garwood's credibility was supported by specific and legitimate reasons that were based on substantial evidence in the record.

## II. Plaintiff's Credibility

Plaintiff contends that the ALJ erred in evaluating his credibility. Pl.'s Br. 12–16, ECF No. 10. In response, defendant argues that the ALJ's findings are supported by substantial evidence. Def.'s Br. 8–16, ECF No. 11.

An ALJ must consider a claimant's symptom testimony, including statements regarding pain and workplace limitations. *See* 20 CFR §§ 404.1529, 416.929. "In deciding whether to

---

[9] The instructions for the Mental Residual Functional Capacity Report read, in relevant part: "[i]f your answers to any of the questions are "Moderately Severe" or "Severe," it would be most helpful to set forth the basis for the answers below." Tr. 1054.

accept [this testimony], an ALJ must perform two stages of analysis: the *Cotton* analysis and an analysis of the credibility of the claimant's testimony regarding the severity of her symptoms." *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). If a claimant meets the *Cotton* analysis[10] and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Id.* (citing *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993)). This Court "may not engage in second-guessing," *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (citations omitted), and "must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation," *Andrews v. Shalala*, 53 F.3d 1035, 1039–40 (9th Cir. 1995) (citations omitted).

The ALJ found that plaintiff's statements concerning his symptoms were "less than fully credible." Tr. 24. In making this determination, the ALJ relied on four bases, including: (1) the objective medical evidence; (2) inconsistencies within the plaintiff's own statements about the scope of his mental impairment; (3) plaintiff's activities of daily living; and (4) evidence that the plaintiff's exhaustion was the result of a learned behavior.

First, the ALJ found that plaintiff's statements concerning his alleged degree of impairment were not consistent with the objective medical evidence of record. Tr. 24. As discussed above in section I, the ALJ properly evaluated the medical evidence relating to plaintiff's mental impairments. Although plaintiff does not challenge the ALJ's evaluation of the medical evidence relating to plaintiff's physical impairments, this Court notes that the objective medical evidence also supports the physical limitations imposed. *See, e.g.*, tr. 364–68

---

[10] "The *Cotton* test imposes only two requirements on the claimant: (1) she must produce objective medical evidence of an impairment or impairments; and (2) she must show that the impairment or combination of impairments *could reasonably be expected to* (not that it did in fact) produce some degree of symptom." *Smolen*, 80 F.3d at 1282 (citing *Cotton v. Bowen*, 799 F.2d 1403, 1407–08 (9th Cir. 1986)).

11 – OPINION AND ORDER

(4/12/2006); tr. 547–53 (10/25/2007); tr. 373–81 (6/16/2008); tr. 390–97 (7/3/2008); tr. 429–36 (5/28/2009); tr. 442 (12/21/2009).

Second, the ALJ found that plaintiff's statements concerning the scope of his mental impairment were inconsistent. Tr. 24 ("I find it very telling that the claimant repeatedly asserted at the beginning of this process that he had no significant mental problems."). For example, in 2008 and 2009, plaintiff repeatedly reported to providers that he did not have a mental impairment. *See* tr. 609 (7/16/2008); tr. 607 (8/15/2008); tr. 601 (10/6/2008); tr. 576 (12/18/2008); tr. 572 (1/23/2009). These assertions largely conflicted with other statements made by plaintiff during that same period. *See* tr. 616 (5/23/2008); tr. 384 (6/20/2008); tr. 288 (3/18/2009); tr. 309, 311 (5/4/2009); *see also* tr. 328 (8/4/2009); tr. 105, 107–09 (11/14/2011). The ALJ properly considered these inconsistencies in evaluating plaintiff's credibility. *See Thomas*, 278 F.3d at 960 (noting that an ALJ may use "ordinary techniques of credibility evaluation" (citations and internal quotation marks omitted)).

Third, the ALJ found that plaintiff's daily activities were not consistent with his alleged degree of impairment. *See* tr. 18, 22, 24. The ALJ explained in part:

> [T]he claimant indicated that he lived with his mother and that he took care of her to the best of his ability. He stated that their home was heated by a woodstove (or fireplace of some kind) and that he was responsible for chopping the wood, toting the wood, and tending the fire. He also performed most, if not all, of the household chores and cooking. He went shopping as needed. He could drive. He could handle money adequately. He attended church two to three times weekly and participated in the choir and Bible study. He noted that he could lift up to 30 pounds comfortably.
>
> . . .
>
> The claimant's ongoing activities, such as caring for his mother, singing in the church choir, and driving disabled veterans to medical appointments, imply a higher degree of functioning than he alleges.

Tr. 18, 24. An ALJ may rely on daily activities to form the basis of an adverse credibility determination if those activities contradict a plaintiff's testimony or involve the performance of physical functions that are transferable to a work setting. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007). Defendant contends that plaintiff's daily activities contradict his testimony. *See* Def.'s Br. 9–11, ECF No. 11. This Court looks to the record.

Plaintiff alleges that his disability began on January 25, 2006. *See* tr. 13, 126. Since that time, plaintiff cared for his elderly mother in 2008, 2009, and 2010, *see* tr. 94, 305, 507, 562, 607, 732, he drove other veterans as part of the Vet Lift program in 2010 and 2012, *see* tr. 746, 913, 917, and he actively participated in his church's choir between 2007 and 2011, including acting as choir director, *see* tr. 94, 308, 386, 507, 556, 560, 562, 746, 840. In addition to those activities, plaintiff also: prepared himself meals; cleaned; laundered clothing; cut and carried firewood; mowed the lawn; read; watched television; shopped for groceries; and transported himself and his family members to appointments. *See* tr. 304–08, 507. These daily activities can be reasonably interpreted as inconsistent with plaintiff's alleged degree of impairment. For example, in March 2009, plaintiff reported that his depression was "overwhelming" and caused a "lack of concentration and motivation" resulting in forgetfulness. Tr. 288. Nonetheless, plaintiff also reported at that time that he cared for himself, his elderly mother, and his cat, and that he performed various household tasks, e.g., he washed dishes and collected firewood. *See* tr. 304. In April 2012, plaintiff reported that he continued to drive other veterans to and from appointments despite moderate depression and severe anxiety. Tr. 913–14.

Fourth, the ALJ found that plaintiff's reported limitations regarding his physical exhaustion and related need to frequently nap were not fully credible. Tr. 24. The ALJ explained in part:

13 – OPINION AND ORDER

> [Plaintiff] acknowledged part of his sleep difficulty and daytime tiredness stems from his years of working at night and sleeping during the day. He said he naps but it depends on what he has going [on], indicating he naps because he can but can avoid naps if he has something to do. . . . [T]his reflects his learned ability to take "power nap[s]" to restore his energy.

*Id.* Plaintiff, primarily in reliance on comments made by Dr. Garwood and Lare Lamm, argues that the ALJ unreasonably interpreted plaintiff's testimony. *See* Pl.'s Br. 15, ECF No. 10 (citing tr. 314, 953). This Court is not persuaded.

Plaintiff testified in 2011 and 2012 that he slept less than three hours each night. *See* tr. 73–74, 106. Plaintiff noted that his difficulties sleeping stemmed from his career working graveyard shifts. Tr. 73, 106. Plaintiff also noted that he typically power slept to restore his energy three times each day, but was able forgo such power sleep if he had things to do. Tr. 73. The ALJ reasonably interpreted this testimony as reflecting a learned ability to take power naps consistent with the RFC. To the extent that plaintiff challenges the ALJ's evaluation of Dr. Garwood's and Ms. Lamm's credibility, those evaluations are addressed in Sections I and III.

In sum, the ALJ's evaluation of plaintiff's credibility was supported by specific, clear and convincing reasons that were based on substantial evidence in the record.

### III. Lay Witness's Credibility

Plaintiff contends that the ALJ improperly rejected functional limitations identified by Lare Lamm, plaintiff's sister. *See* Pl.'s Br. 16–18, ECF No. 10. In response, defendant contends that the ALJ provided germane reasons for rejecting these limitations *See* Def.'s Br. 16–17, ECF No. 11.

"Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001)

14 – OPINION AND ORDER

(citation omitted); *see also Merrill ex rel. Merrill v. Apfel*, 224 F.3d 1083, 1085 (9th Cir. 2000) ("[A]n ALJ, in determining a claimant's disability, must give full consideration to the testimony of friends and family members." (citation omitted)).

Ms. Lamm submitted a third-party function report dated May 7, 2009. *See* tr. 313–20. In that report, Ms. Lamm indicated that plaintiff cared for his mother (e.g., he prepared her meals), cared for a cat, maintained his personal care, prepared meals for himself (e.g., he reheated leftovers and purchased fast food), mowed the lawn, collected and cut firewood daily, shopped for groceries weekly, was able to drive an automobile, watched television frequently, and attended church at least once weekly. *See* tr. 313–15, 317–18. Ms. Lamm also indicated that plaintiff had difficulties sleeping, was easily exhausted from physical and mental exertion, lacked motivation, had an impaired short-term memory, and was "very slow" in decisionmaking. *See* tr. 313–18, 320.

The ALJ, having reviewed this report, rejected Ms. Lamm's reported observations because: (1) she had repeatedly attempted to "control [plaintiff's] life," tr. 21–22, 26; and (2) her observations were inconsistent with plaintiff's statements, tr. 26. Both of these explanations constitute germane reasons to reject Ms. Lamm's observations.

First, the ALJ found that Ms. Lamm had repeatedly attempted to control plaintiff's life, which included encouraging plaintiff to seek benefits so that "he [could] move out of her home." Tr. 21–22 (citing tr. 582–91).[11] Ms. Lamm's financial motivation, particularly when considered

---

[11] On November 25, 2008, and December 8, 2008, plaintiff, who was accompanied by his sister, underwent a five-hour neuropsychological evaluation. *See* tr. 582–88. Evaluation examiners Rex Turner, Ph.D., and Scott Woods, M.A., noted:

> [Ms. Lamm] also argued with the veteran, was confrontational, and became agitated when she learned of the veteran's high scores on the tests that were administered to him. . . . During testing the veteran was alert, communicative, and cooperative with the

15 – OPINION AND ORDER

in light of her documented conduct, *see, e.g., supra* n.11; tr. 568–69, 570, 572, constitutes a germane reason to reject her reported observations, *cf. Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009) ("[E]vidence that a specific spouse exaggerated a claimant's symptoms in order to get access to his disability benefits . . . might suffice to reject that spouse's testimony.").

Second, the ALJ found that Ms. Lamm's statements about plaintiff's mental impairments contradicted plaintiff's own statements. Tr. 26. For example, during a meeting with Dr. Joffe in 2008, Ms. Lamm reported that plaintiff had "PTSD to the max" and that she believed his functioning was impaired. Tr. 384. A few months later, plaintiff informed a social worker that he did not accept his sister's assertions that he was mentally impaired. Tr. 601; *see also* tr. 607 ("My sister controls everything . . . . [She and my mother] tell me I'm mentally impaired, I don't think I am but they are always telling me that, I just don't say anything. I just sit there."). These contradictions constitute a germane reason to reject Ms. Lamm's assertions.

In any event, an error is harmless if "inconsequential to the ultimate nondisability determination." *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir.2006). If, for example, "lay witness testimony does not describe any limitations not already described by the claimant, and the ALJ's well-supported reasons for rejecting the claimant's testimony apply equally well to the lay witness testimony," then this Court may deem the ALJ's failure to articulate germane reasons harmless. *See Molina*, 674 F.3d at 1117. Ms. Lamm's description of

---

> examiner. When his sister was in the room, he was quiet and offered little information. He attempted to contradict her a few times, but he backed down after she argued against what he was saying. [Ms. Lamm] talked of . . . her frustration of the [plaintiff's] intrusion into her life, and her desire for him to be paid money from the government so he can move out of her home.

Tr. 583.

plaintiff's limitations, except as to the general assertions of mental impairment discussed in this section, is largely similar to plaintiff's own statements. *Compare* tr. 313–20, *with* tr. 304–12. These proffered limitations, to the extent that they were inconsistent with the RFC, were properly rejected in the ALJ's consideration of plaintiff's own credibility. *See supra* § II. Thus, even had an error been committed, such an error was harmless.

## **CONCLUSION**

For these reasons, the Commissioner's final decision is AFFIRMED.

IT IS SO ORDERED.

DATED this 24th day of September, 2015

                          ___s/ Michael J. McShane_____
                               **Michael J. McShane**
                              **United States District Judge**